U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 APR -4  PM 12: 02

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          )
                                   )
v.                                 )          Case No. 2:18-cr-00060
                                   )
ANDREW WILLIAMS,                   )
                                   )
Defendant.                         )

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION TO SUPPRESS FRUITS OF ARREST,**
**GRANTING DEFENDANT'S MOTION TO SUPPRESS FRUITS OF**
**AUTOMOBILE SEARCH, GRANTING DEFENDANT'S MOTION TO**
**SUPPRESS HIS STATEMENTS, AND GRANTING DEFENDANT'S MOTION**
**TO SUPPRESS SUGGESTIVE IDENTIFICATION**
(Docs. 24, 25, 26, 27)

Defendant Andrew Williams is charged with knowingly and intentionally

possessing with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a) and

841(b)(1)(B). Pending before the court are Defendant's motion to suppress fruits of his

arrest, motion to suppress fruits of an automobile search, motion to suppress statements

he made following his arrest, and motion to suppress a suggestive identification. (Docs.

24, 25, 26, 27.) The government opposes the motions. The court held an evidentiary

hearing on February 20, 2019 at which Drug Enforcement Agency ("DEA") Special

Agent ("SA") Timothy Hoffmann, DEA SA Kristian Pinkham, and Task Force Officer

("TFO") Chris May testified.

Defendant is represented by Robert W. Katims, Esq. The government is

represented by Assistant United States Attorney Matthew J. Lasher.

**I.      Findings of Fact.**

The government has established the following facts by a preponderance of the

evidence. SA Hoffmann is a case agent employed by the DEA who has been trained in

identification procedures, among other things. On May 17, 2018, he received a tip from a

source of information that a female named Danielle Guerin would be traveling to

Winooski, Vermont to purchase $500 worth of cocaine base from a black male from Pennsylvania who wore glasses and was well-dressed.[1] SA Hoffmann had worked with the source of information previously. The government offered no evidence of the source's reliability beyond what it claims is corroboration of the source's tip.

On the same day the tip was provided, SA Hoffmann, as well as other law enforcement agents, set up surveillance in the area of St. Paul Street in Burlington, Vermont, where they observed the source of information as well as another female and a male. SA Hoffmann recognized the other female as Danielle Guerin. SA Hoffmann was aware that Ms. Guerin was a drug user and was suspected of supplying drugs to other individuals. At some point, the three individuals entered a vehicle. The agents followed the vehicle as it traveled to Main Street in Winooski and parked at a gas station. SA Hoffmann, who was parked in a commercial parking lot on Union Street in Winooski, observed Ms. Guerin leave the gas station, walk west on Union Street, and turn left onto Weaver Street. He could not see 111 Weaver Street from his location. Although it is not clear from the evidence, it appears that 111 Weaver Street is a multi-unit building.[2]

SA Hoffmann drove down the block of Weaver Street, but he did not observe Ms. Guerin. He circled the block. After approximately three minutes, he observed Ms. Guerin leaving 111 Weaver Street, walking north on Weaver Street, and taking a right on Union Street. SA Hoffmann did not witness a drug transaction and he did not clarify whether he saw Ms. Guerin on the porch or whether he actually saw her exit the building.

SA Hoffmann left his vehicle, approached Ms. Guerin, and demanded that she "hand over the crack." He testified that at the time he gave this order, Ms. Guerin was

---

[1] The police report, which was not introduced into evidence at the suppression hearing but which was attached to the government's opposition, states that the source of information described Defendant as a black male from Philadelphia who wore glasses and looked like a "nerd."

[2] The court infers this from SA Hoffmann's subsequent text message to Ms. Guerin. *See infra* p. 6 (asking what apartment at 111 Weaver Street Defendant exited from to which Ms. Guerin appears to reply that Defendant was sitting in a chair on the porch).

2

under arrest.[3]  In response to SA Hoffmann's command, Ms. Guerin produced a plastic bag containing a white chunky substance from within her bra.  SA Hoffmann asked her if the location was a good place to talk and she replied that it was not.

SA Hoffmann transported Ms. Guerin to a nearby cemetery where they were joined by SA Matt Cannon.  While seated in the vehicle, SA Hoffmann told Ms. Guerin that she was under arrest, implied that she would benefit from cooperation, and questioned Ms. Guerin without the benefit of *Miranda* warnings.[4]  This interview was not recorded.

While SA Hoffmann questioned Ms. Guerin, SA Cannon stood outside the vehicle with a radio and relayed the information Ms. Guerin was providing to the other agents conducting surveillance.  During the course of an approximately ten-minute interview, Ms. Guerin admitted that she purchased $500 worth of crack from a black male named "Sam."  She claimed to have purchased the crack on the front porch of 111 Weaver Street and stated that over the past week, she saw Sam at a Motel 6 to purchase drugs and that earlier that day she had purchased drugs from him.  She provided the cellular phone number that she used for Sam and advised that Sam had twenty ounces of crack in his

---

[3] SA Hoffmann testified that he did not tell Ms. Guerin she was under arrest when he gave her this command.  The arrest of Ms. Guerin took place in a manner similar to that at issue in *United States v. Brown*, No. 17-cr-84-2, slip op. at 2 (D. Vt. July 25, 2018) (observing that an arrest took place when law enforcement intentionally struck the bumper of the vehicle they were following, surrounded the vehicle, and demanded to know where the heroin was located without providing *Miranda* warnings).

[4] The government objected to the introduction of this evidence on the grounds that Ms. Guerin's rights are not at issue in this case.  Defendant countered that a violation of Ms. Guerin's constitutional rights is relevant to the question of whether SA Hoffmann's custodial interrogation of Defendant without *Miranda* warnings was intentional and whether the government otherwise engaged in misconduct.  On that basis, the court did not exclude the evidence.  Although it appears that Ms. Guerin herself may have been arrested without probable cause and was thereafter subjected to custodial interrogation without the benefit of *Miranda* warnings, Defendant has no standing to challenge a violation of Ms. Guerin's Fourth and Fifth Amendment rights.  *See Alderman v. United States*, 394 U.S. 165, 171 (1969) (holding that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated"); *Couch v. United States*, 409 U.S. 322, 328 (1973) (holding that "the Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him").

3

possession. Ms. Guerin described Sam as a young, black male from Philadelphia who wore glasses and was well-dressed. SA Hoffmann transported Ms. Guerin to the Winooski Police Department where she was released without being processed or charged.

While SA Hoffmann questioned Ms. Guerin at the cemetery, SA Pinkham conducted surveillance from a location on Weaver Street, just north of the intersection of Weaver Street and Union Street. He did not observe Ms. Guerin enter or exit 111 Weaver Street, although in the course of his surveillance he saw people coming and going from that address.

From SA Cannon, SA Pinkham learned that Ms. Guerin's source of supply was an African-American male from Pennsylvania who wore glasses, a button-up shirt, and a baggy overshirt or sweater.[5] SA Pinkham observed a black male wearing glasses and a gray button-up shirt exit 111 Weaver Street and get into a gold Chrysler SUV (the "SUV") with Pennsylvania license plates. He noted Defendant's sweater was "open" and "kind of flowing in the wind" as he was walking to his vehicle. At the time, SA Pinkham was approximately one hundred yards from 111 Weaver Street. When asked how much he could see of the residence, he testified "not much" and that he could "kind of" see the door. This area of Winooski has a substantial refugee population and is one of the most racially diverse areas of Vermont.

SA Pinkham radioed his observations to SA Cannon and SA Hoffmann. SA Pinkham then followed the SUV as it drove around the rotary in downtown Winooski, exited onto Route 15, and turned left onto East Street. Upon hearing that SA Pinkham was pursuing the SUV, TFO May and TFO Benjamin Adams followed SA Pinkham's unmarked vehicle onto East Street, each driving a separate unmarked vehicle.

After reaching the end of East Street, the SUV made a three-point turn to face south. SA Pinkham testified that he believed this was a surveillance detection technique to determine whether the operator of the vehicle was being followed. SA Hoffmann

---

[5] This testimony was at odds with SA Hoffmann's testimony that Ms. Guerin's description was only that the male was "well-dressed."

4

communicated to the officers who were following the SUV to stop the vehicle. SA Pinkham drove towards the SUV and motioned for it to stop. The SUV maneuvered around SA Pinkham and was blocked by the other unmarked law enforcement vehicles. SA Pinkham activated white flashing emergency lights that were hidden in the front grill of his vehicle, however, he credibly testified that he is not sure when he did so in the course of the events. Surveillance video footage from a liquor store shows SA Pinkham's vehicle as it travels north on East Street but does not reveal the lights flashing although the quality of the video is less than ideal. TFO May credibly testified that he did not see any emergency lights and could not verify whether they would be visible to the operator of the SUV.

As the unmarked vehicles surrounded the SUV, Defendant turned off the SUV's engine and, in approximately two seconds, exited the vehicle and began running. TFO Adams, TFO May, and SA Pinkham, all of whom were dressed in plain clothes, pursued him. The only police insignia worn by the officers as they ran after Defendant was a badge hung around SA Pinkham's neck. TFO Adams was brandishing a weapon as he ran although it does not appear to have been visible to Defendant whose back was to law enforcement. From a distance of approximately fifty yards, TFO May shouted "stop, police." SA Pinkham also believes that he shouted "stop, police." The government proffered no evidence that this command was heard or reasonably could have been heard by Defendant.

While running, TFO Adams fell and broke his arm. TFO May eventually caught up with Defendant and tackled him to the ground, handcuffing and arresting him. At the scene of the arrest, agents discovered a broken cell phone which they later confirmed had a phone number that matched the phone number provided to them by Ms. Guerin for "Sam."

A search incident to arrest revealed that Defendant was in possession of $3,636.49. TFO May escorted Defendant to a law enforcement vehicle. In the vehicle, TFO May told Defendant that he was responsible for TFO Adams's injury. TFO May did not administer *Miranda* warnings before making this statement. Defendant denied that

he was responsible. In response to a question by Defendant as to what had happened, SA Pinkham stated that Defendant would find out soon enough and he knew what he did.

Defendant's SUV was transported to the Winooski Police Department where it was searched without a warrant or Defendant's consent. Approximately seventeen grams of suspected cocaine base and approximately $4,904.00 were found concealed below the center console of the vehicle. It is not clear whether any portion of the SUV's interior was dismantled to locate this evidence.

After his arrest, Defendant was transported to the Winooski Police Department where he was questioned by SA Hoffmann. SA Hoffmann, who had not seen Defendant previously, used a cellular phone in the sally port to take a photograph of Defendant without his glasses. The photograph depicts an African-American male with a beard and mustache, a close-cut afro, a dark-colored button-up shirt, and a patterned light-colored overcoat. SA Hoffmann sent the photo to Ms. Guerin via text with the following message: "Is this the guy[?]" Ms. Guerin responded, "Yes[.]" SA Hoffmann then texted: "What door did he come out of at weaver st apt?" to which Ms. Guerin responded: "He didn't he was sitting in the chair[.]" SA Hoffmann captured the text message on his phone and a screen shot of it was introduced into evidence. SA Hoffmann testified that at the time that he took Defendant's photograph, there were no exigent circumstances and he was not concerned that the wrong person had been arrested. Somewhat inconsistently, he stated that he took the photograph because he wanted to confirm that the person in custody was Ms. Guerin's source of supply.

In a secure room inside the Winooski Police Department which is not accessible to the public, Defendant was questioned by SA Hoffmann with TFO May present. SA Hoffmann and TFO May were armed at the time but their weapons were not visible. The interview room contained a table and chairs as well as fingerprinting and photograph processing equipment. SA Hoffmann recorded the audio of the interview.

SA Hoffmann introduced himself and TFO May and explained briefly their roles with the DEA. Using what he described as a U.S. Marshals booking form, SA Hoffmann asked Defendant to provide his name, height, weight, date of birth, place of birth,

6

address, and marital status.[6] In response to a question about Defendant's marital status, Defendant stated, "I fucked up," and "I was doing good, man, working, man. Fuck. Shit fucked up, man." (Gov. Ex. 3, Suppression Hearing, Feb. 20, 2019, 4:04 – 4:15.) While SA Hoffmann filled out the U.S. Marshals Service form, Defendant twice asked when he would receive *Miranda* warnings. SA Hoffmann did not respond to those inquiries.

SA Hoffmann explained that DEA agents pursue people at the bottom of the supply chain and work their way "up the ladder." He advised Defendant that he had contacts in Philadelphia who were aware of drug trafficking activity and explained the benefits of cooperation. He stated:

> Your cooperation, you know, helps you out. Because I can call my AUSA and say, "Hey, Andrew was very cooperative. He said there's this going on here, this was going on there." And he'll say, "great, let's go let Andrew sleep in his bed tonight, and maybe we'll figure out something down the road."

*Id.* at 5:55 – 6:12. Defendant interrupted to ask about the chances of him actually being released, and SA Hoffmann did not answer him, stating: "I'm still doing my thing here." *Id.* at 6:17 – 6:19. SA Hoffmann then explained some of the evidence against Defendant.

After approximately six minutes of discussion, Defendant was asked if he was willing to answer questions about who he answered to. Defendant responded that he was "just trying to get home." *Id.* at 7:48 – 7:50. SA Hoffmann stated:

> I know sometimes people are hard on their luck and one of their boys says, hey, you want to come up and make a quick rack for a day or two, then you do this, you do my work and you get this cut, and you know, that's glorified. You're getting the girls, you're getting the money, and you're going back.

---

[6] SA Hoffmann testified that he fills out a United States Marshals Service form for every prisoner that he arrests federally. In addition to standard booking information, the form requires information about an arrestee's relatives, friends, vehicles, employment, and finances. The form contains a note in the upper right-hand corner which advises arresting agents: "All blocks must be completed before we accept your application!!" (Gov. Ex. 4, Suppression Hearing, Feb. 20, 2019.) SA Hoffmann testified that he keeps copies of the form in his vehicle for when someone is processed and handed over to the U.S. Marshals.

*Id.* at 8:00 – 8:14. In response, Defendant stated: "I was just trying to pay my rent, Officer" and "I fucked up, man." *Id.* at 8:14 – 8:24.

SA Hoffmann then read Defendant *Miranda* warnings, after which Defendant signed a written waiver form.[7] In the course of the subsequent interview, SA Hoffmann reiterated the benefits of cooperation, advising Defendant:

> You need to take a leap of faith because I need to call the assistant U.S. attorney and say, hey John, my boy Andrew, he's been honest with me, it took a little bit for him to be honest and this is the type of work he can do right now. And he'll say, well what do you think?

*Id.* at 28:24 – 28:40.

SA Hoffmann testified that it is part of his personal process to talk to a suspect prior to issuing *Miranda* warnings in order to build rapport, explain the benefits of cooperation, and to convey the strength of some of the evidence against him or her. He further explained his personal process in a colloquy with Defendant's attorney:

> Q: So again I will ask you the question. Why have this talk at Mr. Williams prior to reading him *Miranda*? Other than just that's the way you do it. Is there a purpose for it?
>
> A: Yes.
>
> Q: What's the purpose?
>
> A: As I said in the beginning of my testimony, my goal is to work the way up the ladder and not down the ladder and to go to source cities and locate and identify and arrest drug dealers.
>
> Q: And you can do all of that after *Miranda*, right?
>
> A: Correct.
>
> Q: Why do you do it before *Miranda*?
>
> A: Because you can do it before *Miranda*, too.
>
> Q: I mean, the—part of the purpose of it is to make it more likely that he might waive *Miranda* and speak with you, correct?

---

[7] The box on the Waiver of Rights form indicating that the warnings were provided was not checked, the time was not recorded, and no witness signature appears on the form. However, the recording submitted by the government establishes that *Miranda* warnings were in fact provided by SA Hoffmann to Defendant.

A: Correct.

Q: In fact, you do kind of the—the waiver portion before you even read *Miranda* by, if I heard it correctly. You say, you talk, you do the demeanor, the rapport, the explaining cooperation, the evidence against him, and then say, hey, now do you want to talk to me? And then when he says yes, then you read him *Miranda*, correct?

A: Yes.

After Defendant signed the written *Miranda* waiver form, he made further incriminating statements, including statements regarding the contraband concealed in his vehicle. He also admitted that he had been convicted and served time on a federal charge in Vermont. In the course of the interview, Defendant asked as well as answered questions. SA Hoffmann could not recall the duration of the interview beyond estimating that it lasted over one hour. The tone of the interview was consistently conversational and neither SA Hoffmann nor TFO May verbally threatened Defendant or made a physical display of force.

## II.    Conclusions of Law and Analysis.

### A.    Whether Defendant's Arrest was Supported by Probable Cause.

Defendant moves to suppress any evidence derived from his May 17, 2018 arrest on the grounds that he was arrested in violation of the Fourth Amendment.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "An arrest[] . . . is a serious personal intrusion regardless of whether the person seized is guilty or innocent." *United States v. Watson*, 423 U.S. 411, 428 (1976) (Powell, J., concurring).

"The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation marks omitted). Probable cause

"exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 363-64 (2d Cir. 2011) (internal quotation marks omitted).

"To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause[.]" *Pringle*, 540 U.S. at 371 (internal quotation marks omitted). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (citations and internal quotation marks omitted). Where the defendant challenges a warrantless arrest, "[t]he [g]overnment bears the burden of proof as to establishing probable cause." *Id.* at 158.

The government asserts that Ms. Guerin's description was reliable because her description was corroborated by the source of information's description of Defendant as a black male who wore glasses and was well-dressed and because Ms. Guerin had an opportunity to see "Sam" when she purchased cocaine base from him at a Motel 6. In addition, Ms. Guerin implicated herself in criminal activity[8] and provided a cell phone number for her source of supply. Ms. Guerin described the person from whom she had purchased cocaine base as a young, black male who was well-dressed, wore glasses, and was from Pennsylvania. Alternatively, she stated he was a black male wearing glasses, a

---

[8] Although courts "have recognized that criminals caught red-handed may be reliable sources of information because [t]he informant's interest in obtaining leniency creat[es] a strong motive to supply accurate information, [courts] have also cautioned that a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify[.]" *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (citations and internal quotation marks omitted).

button-up shirt, and an overcoat. SA Pinkham later confirmed that an African-American male wearing a button-up shirt and an overcoat departed 111 Weaver Street and entered an SUV with Pennsylvania license plates.

Regardless of which description Ms. Guerin provided, a vague description that could apply to any number of individuals is not sufficient to establish probable cause for an unwitnessed drug transaction in the absence of evidence of Ms. Guerin's reliability.[9] As a suspected trafficker and user of drugs, the drugs in Ms. Guerin's bra were just as likely to have been obtained from a source other than Defendant.

The government further relies on Defendant's flight from his vehicle as evidence of consciousness of guilt. "[U]nprovoked flight upon noticing the police[] . . . is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances." *D.C. v. Wesby*, 138 S. Ct. 577, 587 (2018) (internal quotation marks omitted); *see also United States v. Vanhoesen*, 552 F. Supp. 2d 335, 341 (N.D.N.Y. 2008) (ruling that while "flight alone is generally not sufficient to justify a stop or pursuit, [d]efendant's flight may be considered in conjunction with other attendant circumstances . . . to establish probable cause").

In the instant case, when Defendant ran from his vehicle, there is no evidence that he knew he was fleeing from the police. Flight from unmarked vehicles and plainclothes law enforcement officers with no evidence that Defendant could see emergency lights or hear an order to stop is at best ambiguous. *See Wong Sun v. United States*, 371 U.S. 471,

---

[9] *See United States v. Fisher*, 702 F.2d 372, 377, 379 (2d Cir. 1983) (holding that a description of the suspect as a tall, possibly slim, black male did not give rise to probable cause because it was a "most general description" that was "equally applicable to a number of individuals likely to be in the area"); *United States v. Grant*, 682 F.3d 827, 833 (9th Cir. 2012) (holding that "although [the defendant] may have fit the description of the suspect as 'Male, black, dark complexion, thin build,' that description was much too general by itself to support [probable cause]"); *United States v. Short*, 570 F.2d 1051, 1054 (D.C. Cir. 1978) (holding that although the defendant was found approximately two blocks from the crime scene with the same haircut and similar clothing to the suspect, "the description . . . fit[] many young people in that area of Washington[,]" and the officers thus lacked probable cause to arrest the defendant); *United States v. Livingston*, 191 F. Supp. 3d 334, 343 (D. Vt. 2016) (holding that a description of defendant as a larger, black woman with "manly features" traveling alone was "insufficient to give rise to probable cause").

11

482 (1963) ("[w]hen an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight . . . must be regarded as ambiguous conduct").[10]

Although a close question, based on the totality of the circumstances, the government has failed to establish by a preponderance of the evidence that there was probable cause for Defendant's arrest for drug trafficking.[11]

## B. Whether the Currency and the Cellular Phone Seized from Defendant's Person Must be Suppressed.

The exclusionary rule generally subjects "[e]vidence obtained from an unlawful search or seizure . . . to exclusion" as fruit of the poisonous tree. *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2006). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun*, 371 U.S. at 484. A court should inquire whether, "granting [the] establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation marks omitted). This inquiry "does not hinge on a simple 'but for' analysis, but rather, 'must be answered on the facts of each case.'" *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). "The relevant constitutional question is 'whether the connection between the lawless conduct

---

[10] These facts are distinguishable from *United States v. Stubblefield* in which the court found probable cause to arrest the defendant where witness descriptions matched the defendant's "unusual visage and physique," he was found at or near the location where witnesses had previously seen him, and he fled upon confrontation with the police. 820 F.3d 445, 449 (D.C. Cir. 2016). In that case, multiple witnesses provided a far more specific description of the defendant which was used to produce a police sketch, describing him as a middle-aged, thin, African-American man, approximately 5'1'' or 5'2'', with some sort of facial disfigurement which was described as "scarring" or "markings[.]" *Id.* at 446 (internal quotation marks omitted). Additionally, there was no indication in *Stubblefield* that the police officers from whom the defendant fled were unidentified.

[11] The law enforcement agents pursuing Defendant could have lawfully conducted a *Terry* stop and investigated further without violating the Fourth Amendment. They, however, chose to arrest him instead. *See Livingston*, 191 F. Supp. 3d at 344 (holding that, in determining an arrest was unlawful, the court "need not decide whether reasonable suspicion existed" because law enforcement "immediately arrested" the defendant based on a vague description and her exit from a bus from a source city).

12

of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.'" *Mosby*, 470 F.3d at 520 (quoting *United States v. Ceccolini*, 435 U.S. 268, 273-74 (1978)). "The government bears the burden of proving that the taint has been alleviated." *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990).

A search conducted incident to Defendant's arrest revealed $3,636.49 and a cellular phone which agents determined belonged to Defendant. This evidence was discovered immediately following Defendant's arrest, on or near his person, and there were no intervening circumstances. The government cites nothing that would dissipate the taint of Defendant's unlawful arrest. Accordingly, the currency and phone seized from Defendant's person at the time of his arrest must be suppressed as the fruit of the poisonous tree. *See Wong Sun*, 371 U.S. at 485, 488 (excluding evidence that is the "direct result of an unlawful invasion" because it is "fruit of the poisonous tree") (internal quotation marks omitted).

C. **Whether Defendant's Statements to Law Enforcement Must be Suppressed as Tainted by an Unlawful Arrest.**

Defendant contends that the statements he made to agents at the Winooski Police Department must be suppressed as the fruit of an unlawful arrest. "It is settled law that a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (internal quotation marks omitted).

The Supreme Court has enumerated four factors to be analyzed in determining whether an unlawful seizure tainted a subsequent confession: "(1) the administration of *Miranda* warnings; (2) '[t]he temporal proximity of the arrest and the confession'; (3) 'the presence of intervening circumstances'; and (4) 'particularly, the purpose and flagrancy of the official misconduct.'" *Mosby*, 470 F.3d at 521 (quoting *Brown*, 422 U.S. at 603-04). "The [government] bears the burden of proving that a confession is admissible." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982).

13

After his arrest, Defendant was transported to the Winooski Police Department where he was questioned by SA Hoffmann, initially without the benefit of *Miranda* warnings.

> Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Elstad*, 470 U.S. at 307. SA Hoffmann was not the only law enforcement officer who elicited incriminating statements from Defendant without *Miranda* warnings. While Defendant was in custody, TFO May told Defendant that he was responsible for TFO Adams's injury even though Defendant had no physical contact with TFO Adams and no apparent ability to see him fall as he gave chase. Not surprisingly, Defendant responded to this accusation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation"). The delay in providing *Miranda* warnings thus weighs in favor of suppression. *See Brown*, 422 U.S. at 602 ("If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.") (italics supplied).

The custodial interrogation of Defendant took place immediately following his arrest without the presence of intervening circumstances. The close physical and temporal proximity of Defendant's confession to his illegal arrest in an unbroken sequence of police interaction thus also weighs in favor of suppression.

With regard to the final *Brown* factor, the Second Circuit has explained that:

> [P]urposeful and flagrant police misconduct exists where (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

14

*United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (citation and internal quotation marks omitted).

Although SA Hoffmann directed other agents to "make a stop" on Defendant's vehicle based upon a vague description provided by Ms. Guerin, there is no evidence that he authorized an arrest of Defendant. Instead, it appears that the other agents independently decided to effectuate an arrest once Defendant fled from his vehicle. As noted previously, the existence of probable cause is a close call. Accordingly, while the police conduct at issue was purposeful, the court finds no evidence that Defendant's arrest was undertaken in flagrant disregard of the law.

On balance, the *Brown* factors require suppression of Defendant's statements because the "deterrence benefits [of exclusion] outweigh its substantial social costs[.]" *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal quotation marks omitted). As the Second Circuit explained: "When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts." *Mosby*, 470 F.3d at 523 (internal quotation marks omitted). Defendant's statements must therefore be suppressed. *See Elstad*, 470 U.S. at 306 ("The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession.").

To facilitate appellate review, the court considers Defendant's further requests to suppress his statements on two additional grounds: they were the product of *Miranda* violations and they were involuntary.

### D. Whether Defendant's Statements Were Obtained in Violation of *Miranda*.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. In order to protect this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant

15

unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]" *Id.* at 478.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. The "functional equivalent" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

While the government concedes that Defendant was in custody when he was questioned at the Winooski police station, it contends that Defendant was initially asked only standard booking questions. *Miranda* warnings are not required for "routine" questions designed to elicit "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation omitted).

After routine booking questions, the government contends that SA Hoffmann merely confronted Defendant with the evidence against him. "Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation." *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995). Moreover, "courts have generally rejected claims . . . that disclosure of . . . inculpatory evidence possessed by the police, without more, constitutes 'interrogation[.]'" *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009); *see also Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (holding that police officer's "matter-of-fact communication of the evidence against [defendant] and the potential punishment he faced" did not constitute interrogation). However, "this practice has the potential to constitute custodial interrogation if it ventures too far." *United States v. Battle*, 2013 WL 5769982, at *12 n.7 (D. Vt. Oct. 24, 2013); *see also Toliver v. Gathright*, 501 F. Supp. 148, 153 (E.D. Va. 1980) (observing that "all of the circumstances point toward the conclusion that

16

informing [a suspect] of [a statement] implicating him was likely to prompt petitioner to incriminate himself").[12]

While confronting Defendant with the evidence against him, SA Hoffmann did not instruct Defendant to refrain from making any statements, nor did he attempt to stop Defendant from responding. When Defendant twice asked about *Miranda* warnings, SA Hoffmann ignored those requests and told Defendant he was still "doing his thing." The failure to advise Defendant to remain silent makes it difficult for the court to conclude that Defendant's statements were volunteered.

Although prior to administering *Miranda* warnings SA Hoffmann generally made more statements than interposed direct questions, this is not dispositive of whether custodial interrogation took place. Law enforcement may violate *Miranda* by statements as well as direct questioning. *See Innis*, 446 U.S. at 298 ("[R]eferences . . . to questioning might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody. We do not, however, construe the *Miranda* opinion so narrowly.") (internal quotation marks omitted); *United States v. Rosario-Cinturon*, 194 F. Supp. 3d 161, 170 (D.P.R. 2016) (observing that a court "should not simply dismiss all statements made by the police that do not end in a question mark").

SA Hoffmann described his investigative techniques and his contacts in Philadelphia which Defendant had identified as his hometown. In doing so, SA Hoffmann suggested that law enforcement had evidence of Defendant's drug trafficking beyond that gleaned from Defendant's arrest. SA Hoffmann told Defendant "cooperation

---

[12] *Cf. Caputo v. Nelson*, 455 F.3d 45, 50-51 (1st Cir. 2006) (noting that "[s]ince *Innis*, a number of courts have considered whether police may confront a suspect with evidence against him without engaging in the functional equivalent of interrogation" and noting a brief statement that law enforcement "possessed inculpatory evidence[,]" providing "results of [an] investigation to a suspect who had herself asked the officer to let her know such results," and identifying the victim to the suspect and "briefly stat[ing] the evidence against him" have all been held insufficient to constitute custodial interrogation); *with United States v. Szymaniak*, 934 F.2d 434, 437 (2d Cir. 1991) (holding that custodial interrogation occurred where officer visited defendant "[t]hree or four times" to confront him with inculpatory information and "request[ed] that he give [the police] a statement") (alterations omitted).

. . . helps you out" and suggested that Defendant would be allowed to "sleep in his bed" if he spoke to the agents. SA Hoffmann directly asked Defendant if he would be willing to tell law enforcement for whom he was working.

SA Hoffmann also made statements minimizing Defendant's role in the suspected crime and blaming societal factors for his involvement, stating that Defendant might be someone who was "hard on [his] luck and one of [his] boys says, hey you want to come up and make a quick rack for a day or two, then you do this, you do my work and you get this cut, and you know, that's glorified." SA Hoffmann further provided relatively innocuous explanations as to why Defendant might engage in drug dealing: "You're getting the girls, you're getting the money, and you're going back." *See Innis*, 446 U.S. at 299 (noting the *Miranda* court defined "interrogation practices" to include "the use of psychological ploys, such as to posit the guilt of the subject, to minimize the moral seriousness of the offense, and to cast blame on the victim or on society. It is clear that these techniques of persuasion, no less than express questioning . . . in a custodial setting . . . amount to interrogation") (citation and internal quotation marks omitted). In response, Defendant stated: "I was just trying to pay my rent, Officer" and "I fucked up, man."

The Second Circuit has opined that there is generally no legitimate reason beyond officer and public safety to engage in custodial interrogation without *Miranda* warnings:

> [W]e agree with the *Williams* Court in its observation that "[o]nce a law enforcement officer has detained a subject *and subjects him to interrogation* . . . there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason . . . is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness."

*United States v. Capers*, 627 F.3d 470, 480-81 (2d Cir. 2010) (quoting *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006)). In this case, SA Hoffmann

acknowledged that the purpose of his pre-*Miranda* discussion was to make it more likely Defendant would waive his *Miranda* rights and confess.

Because prior to administering *Miranda* warnings, SA Hoffmann's statements and questions to Defendant were "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301, *Miranda* warnings were required and all of Defendant's pre-*Miranda* statements except those in response to booking questions must be suppressed.

Defendant argues that even if he was ultimately provided with *Miranda* warnings, his written waiver of his *Miranda* rights was not valid. However, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver[.]" *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). There is no evidence that the *Miranda* waiver was obtained through trickery, deception, or coercion. SA Hoffmann conditioned his representation that Defendant would receive more lenient treatment if he cooperated with a statement that it was the AUSA who would make that determination.

There is also no evidence to support a conclusion that SA Hoffmann employed a "deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview" requiring exclusion of "postwarning statements that are related to the substance of prewarning statements . . . absent specific, curative steps." *Missouri v. Seibert*, 542 U.S. 600, 621 (2004). Under *Seibert*, the plurality considered the following factors to determine whether *Miranda* warnings "delivered midstream" are effective:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

In the instant case, there was no break in either the timing or the setting of custodial interrogation by the same police personnel. However, prior to *Miranda* warnings only a brief interrogation on a limited subject matter took place. In other words, SA Hoffmann did not deliberately elicit a full confession, issue *Miranda*

19

warnings, and obtain a second confession based on Defendant's initial unwarned statements. Defendant revealed no lack of understanding of his *Miranda* rights and no unwillingness to waive those rights when he believed it was in his interests to do so. Under such circumstances, Defendant's *Miranda* waiver was valid. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (holding that in order to establish that a *Miranda* waiver is valid, "the [government] must show that the waiver was knowing, intelligent, and voluntary").

### E.     Whether Defendant's Statements were Made Involuntarily.

Defendant contends that even if his statements are otherwise admissible, they should be suppressed because his confession was not voluntary. The government responds that none of the indicia of involuntariness are present in the instant case. The court agrees.

"A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted); *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). "The voluntariness inquiry" considers "the totality of all the surrounding circumstances, including [(1)] the accused's characteristics, [(2)] the conditions of interrogation, and [(3)] the conduct of law enforcement officials." *Taylor*, 745 F.3d at 23-24 (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (stating that courts "look at the totality of the circumstances . . . to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.") (internal quotation marks omitted); *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary[.]"). The defendant's "mental state" is considered only "to the extent it allowed law enforcement to coerce the individual." *Taylor*, 745 F.3d at 24 (citing *Connelly*, 479 U.S. at 164-65). "The prosecution bears the burden of proving, at

least by a preponderance of the evidence, . . . the voluntariness of the confession[.]"
*Seibert*, 542 U.S. at 608 n.1.

In conducting a voluntariness inquiry, the "most critical circumstance . . . is the
law enforcement officers' conduct." *Green*, 850 F.2d at 902. Relevant considerations
include:

> [T]he repeated and prolonged nature of the questioning or the failure to
> inform the accused of his constitutional rights; whether there was physical
> mistreatment such as beatings; or long restraint in handcuffs, and whether
> other physical deprivations occurred such as depriving an accused of food,
> water or sleep; or even of clothing, for a prolonged period. In
> addition[] . . . police conduct might include psychologically coercive
> techniques such as brainwashing or promises of leniency or other benefits.

*Id.* (citations omitted).

Only one of the relevant factors, a promise of leniency, is present here. However,
"a confession is not involuntary merely because the suspect was promised leniency if he
cooperated with law enforcement officials." *United States v. Guarno*, 819 F.2d 28, 31
(2d Cir. 1987); *see also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (holding
that "promises of leniency do not per se render a confession involuntary"). The
remaining factors weigh heavily in favor of finding Defendant's statements voluntary.
Although the interrogation took place at a police station, the interview was relatively
brief in nature and the tone was consistently conversational. *See United States v. Allen*,
2013 WL 2481528, at \*8 (D. Vt. June 10, 2013) (holding that there was no evidence of
police coercion where the "tone of the interview was conversational and low key");
*United States v. Artis*, 2010 WL 3767723, at \*9 (D. Vt. Sept. 16, 2010) (holding that
where "the interview was conversational in tone and throughout it [defendant's]
demeanor was one of 'almost amuse[ment,]'" the confession was voluntary). Defendant
was not handcuffed, and he was questioned by a single law enforcement officer with only
one other law enforcement officer present. Defendant asked as well as answered
questions thereby exercising his free will. He was not threatened or exposed to a show of
force. *See Green*, 850 F.2d at 902 (finding that the conditions of interrogation did not

21

suggest that defendant's will was overborne where defendant was questioned for several hours in a police precinct).

Defendant had been arrested and convicted on a previous occasion and was thus not new to the criminal justice system. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (holding that a defendant's "extensive criminal record" and "familiar[ity] with police questioning" weighed in favor of finding his statements voluntary). He was not suffering from any mental or physical condition, deprived of food, water, or medication, or shown to be unusually susceptible to police coercion.

Because the totality of the circumstances does not establish that Defendant's will was overborne, the government has established by a preponderance of the evidence that Defendant's confession was voluntary. *See United States v. Haak*, 884 F.3d 400, 416 (2d Cir. 2018) (concluding that statements were made voluntarily where "nothing in the totality of circumstances demonstrate[d] that [defendant's] will was overborne").

**F.      Whether the Fruits of the Automobile Search Must be Suppressed.**

Defendant contends that the cocaine base and currency seized from his SUV are the product of an unlawful arrest and must be suppressed. Alternatively, Defendant argues that the agents lacked probable cause to search his SUV and that the search exceeded the permissible scope of an inventory search. The government asserts that it does not rely on an inventory search, rather it contends that Defendant had no reasonable expectation of privacy in the SUV after he abandoned it or, in the alternative, the DEA agents had probable cause to search the vehicle.

The Second Circuit has held that:

When a person voluntarily abandons property, . . . . he forfeits any reasonable expectation of privacy that he might have had in the property. The fourth amendment's protections, therefore, do not extend to abandoned property.

In determining whether there has been an abandonment, the district court must focus on the intent of the person who is purported to have abandoned the property. [I]ntent may be inferred from words spoken, acts done, and other objective facts.

*United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (citations and internal quotation marks omitted); *see also United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987) ("Abandonment is a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances[.]"). Abandonment is generally defined as "[t]he relinquishing of a right or interest with the intention of never reclaiming it." Black's Law Dictionary 2 (10th ed. 2014).

Defendant's exiting his vehicle and fleeing on foot from unidentified law enforcement officers, without more, does not demonstrate an intent to voluntarily abandon his vehicle and relinquish his privacy interests in it. *Cf. United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (finding that a defendant "relinquished any legitimate expectation of privacy" in his vehicle and its contents when he left his car with the keys in the ignition and fled on foot from a marked police vehicle that had attempted to effectuate a stop by activating emergency lights); *United States v. Walton*, 538 F.2d 1348, 1351 (8th Cir. 1976) (holding that a defendant who abandoned his vehicle as an officer "dressed in his official uniform" approached the car had relinquished Fourth Amendment rights in that vehicle); *United States v. Le*, 402 F. Supp. 2d 1068, 1077 (D.N.D. 2005), *aff'd sub nom. United States v. Kimhong Thi Le*, 474 F.3d 511 (8th Cir. 2007) (holding vehicle was abandoned for purposes of a warrantless search where it slid off a highway and turned over in a ditch, the accident was not reported to authorities, no one showed up to meet the towing company as arranged, and an officer waited on site for over two hours before searching the vehicle).

The government argues that regardless of whether Defendant abandoned the vehicle, the agents had probable cause to search the vehicle based on the information provided by Ms. Guerin coupled with Defendant's flight. "[P]robable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted); *see also United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) ("Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of

23

a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime."). The government has the burden of establishing probable cause for a warrantless search pursuant to the automobile exception. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951) (holding that, when relying upon an exemption from the warrant requirement, "the burden is on those seeking the exemption to show the need for it").

The government points to no evidence that drugs or other contraband were likely to be found in Defendant's vehicle. Ms. Guerin drew no connection between the drug transaction she claimed to have engaged in with Defendant on the front porch of 111 Weaver Street and the likelihood that contraband would be found in his vehicle. While Ms. Guerin indicated "Sam" was from Pennsylvania, she provided no information that he had a vehicle. Likewise, the initial source of information provided no information regarding a vehicle. Defendant's flight from his vehicle was ambiguous in terms of whether it supported a conclusion that drugs would be found therein. As the fruit of an unlawful arrest, evidence derived from Defendant's person cannot provide the basis for probable cause to search his vehicle. *See United States v. Valentine*, 539 F.3d 88, 96 (2d Cir. 2008) ("While police officers may conduct a warrantless search of an individual's personal property if the search is incident to a lawful custodial arrest, officers lacking probable cause to arrest a suspect necessarily lack probable cause to conduct a search incident to that arrest.") (citing *New York v. Belton*, 453 U.S. 454, 460 (1981)).

In order to meet its burden of establishing probable cause, the government must proffer specific facts indicating that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Because the government has failed to proffer these facts, the DEA agents lacked probable cause to search Defendant's vehicle. *See United States v. Rodgers*, 656 F.3d 1023, 1029 (9th Cir. 2011) (finding a lack of probable cause to search a vehicle where the police officer "did not identify any particular facts or observations that led him to believe [that evidence of defendant's crime] was inside [his] car").

## G. Whether the Show-Up Identification and Tainted Fruits of that Identification Must be Suppressed.

Defendant contends that law enforcement obtained an identification from him as the fruit of an unlawful arrest and through an impermissibly suggestive method in violation of the Fifth Amendment. As a result, he asks that both Ms. Guerin's pre-trial identification of him and any future in-court identification by her be suppressed. The government argues that the show-up identification method employed by SA Hoffmann was not unnecessarily suggestive under the circumstances and is independently reliable. It further argues that there is no need to preclude an in-court identification by Ms. Guerin.

While Defendant was in the sally port of the Winooski police station, SA Hoffmann took a photograph of Defendant using a cell phone and sent it to Ms. Guerin, asking: "Is this the guy[?]" Only one photograph was displayed. In the photograph, Defendant was not wearing glasses and his attire was only partially visible. SA Hoffmann testified that the single-photo procedure was not based on exigent circumstances or a need to confirm Defendant's identity. This identification took place immediately following Defendant's arrest with no intervening circumstances. Under *Wong Sun*, the photograph is the fruit of an unlawful arrest and must be suppressed. 371 U.S. at 488 (holding that evidence is "fruit of the poisonous tree" if it "has been come at by exploitation of [the primary] illegality"). For purposes of appellate review, the court addresses whether it should also be suppressed as an improperly suggestive identification that will taint any subsequent in-court identification of Defendant by Ms. Guerin.

Courts must exclude an identification if "the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994) (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall*, 388 U.S. at 302. In this case, a single photograph identification was "inherently suggestive[.]" *Brisco*, 565 F.3d at 88.

25

"Even if [a] procedure [is] unnecessarily (or impermissibly) suggestive, . . . a district court may still admit the evidence if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir. 1994) (internal quotation marks omitted). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). The government, as the proponent of the evidence, has the burden to prove its admissibility. *See Gilbert v. California*, 388 U.S. 263, 272 (1967) (indicating that it is the government's burden to establish that an in-court identification has an independent source).

> To ascertain whether an identification "has reliability independent of the unduly suggestive identification procedures," courts generally look to five established factors, first set forth in *Neil v. Biggers*:
>
> [1] the opportunity of the witness to view the criminal at the time of the crime,
>
> [2] the witness'[s] degree of attention,
>
> [3] the accuracy of the witness'[s] prior description of the criminal,
>
> [4] the level of certainty demonstrated by the witness at the confrontation, and
>
> [5] the length of time between the crime and the confrontation.

*Brisco*, 565 F.3d at 89 (internal citation omitted).

The opportunity of Ms. Guerin to view Defendant at the time of the alleged crime appears to be a matter of minutes. Indeed, any alleged drug transaction took place so quickly that it was not witnessed by law enforcement conducting surveillance. Moreover, the length of time between the alleged crime and the confrontation was relatively brief as Ms. Guerin's identification occurred on the same day as the alleged crime. *See Osborne v. Miller*, 557 F. Supp. 2d 435, 441 (S.D.N.Y. 2008) ("A four-day period will have little, if any, effect upon a witness's recollection[.]").

Although Ms. Guerin claimed to have seen Defendant earlier that day and on prior occasions at a Motel 6, her reliability was not established, and her description of Defendant remained vague, failing to include even obvious characteristics like facial hair,

height, and build. The government proffered no evidence regarding the duration of Ms. Guerin's prior alleged encounters with Defendant, whether others were present, the race and gender of others present, whether Ms. Guerin was under the influence of narcotics at the time, her level of certainty, or her degree of attention.

Viewing the *Biggers* factors as a whole, the government has failed to proffer sufficient facts to support a finding that Ms. Guerin's in-court identification of Defendant will be independently reliable.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress fruits of arrest (Doc. 24), motion to suppress fruits of automobile search (Doc. 25), motion to suppress Defendant's statements (Doc. 26), and motion to suppress suggestive identification (Doc. 27) are GRANTED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___ day of April, 2019.

Christina Reiss, District Judge
United States District Court